RAMOS HERMANOS, Plaintiff and Appellant, *v.* JOSÉ R. NO-GUERA, SECRETARY OF THE TREASURY OF PUERTO RICO, Defendant and Appellee.

No. R-62-75.  Decided December 16, 1963.

542

*Brown, Newsom & Córdova* for appellant. *J. B. Fernández
Badillo, Solicitor General,* and *Juan A. Faría, Assistant
Solicitor General,* for appellee.

Division composed of Mr. Chief Justice Negrón Fernández,
Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

Ramos Hermanos, an agricultural civil partnership
organized on February 23, 1951, purchased on the following
March 6 a rural property of approximately 653 cuerdas
located in the Municipality of Carolina as well as a sugar-
cane plantation, the buildings, certain machinery and the
equipment proper for such operation. Until the end of that
year its activities consisted generally in the harvesting of the
crop acquired and in the cultivation and preparation of the
crop for the following year. The income tax return filed for
the period from March 6 to December 31, 1951, was sub-
mitted on the cash-basis method and showed a loss of
$58,792.61.[1]

In the income tax return for the calendar year 1952 the
partnership included as income ($103,991.10) all the money
received from the sale of its 1952 crop, from sale of molasses
and surplus sugar of the preceding year, as well as subsidies
from two federal agencies. It claimed as deduction the total
expenses incurred in that crop and that of the succeeding

---

[1] The income declared consisted of the amount received from the sale
of the harvested crop ($78,637.72), the benefit payments of the Production
and Marketing Administration ($18,625.94), and the participation in the
surplus molasses produced ($6,198.78), totalling $103,462.44.

In the deductions claimed amounting to $162,255.05 there was included
not only the initial cost of the growing cane, as agreed upon in the bill
of sale ($69,000), but also the expenses of cutting and hauling and of the
preparation and cultivation of the 1952 crop. Among other expenses, claim
was made for wages ($62,583.12), fertilizers ($17,844.79), and purchase
of seeds ($875). The last two items as well as part of the first represent
expenses of the 1952 crop, since on March 6, when the plantation of 1951
was acquired, this crop had to be practically mature and ready for har-
vesting and the only pending expenses were those of its cutting and
hauling.

year ($93,345.16), but it deferred to 1953 the expenses corresponding to the growing crops on the last day of the taxable year ($44,931.74).[2] As a result of this deferment of expenses, it reported a profit of $55,577.68[3] for 1952, but since it carried over the loss from the preceding year ($58,792.61) it determined a net loss of $3,214.93.

For a better understanding of the real issue involved in this appeal, we shall depart for a moment from the bare statement of the facts in order to make an interpretation of such facts. The taxpayer's deferral in 1952 of some of the expenses incurred and paid within the taxable year enabled it to make use of practically all of the loss of the preceding year, which loss under the Act then in force was allowed to be carried over only to the following year, called "second year."[4] If the taxpayer had not deferred the amount of expenses incurred in 1952 corresponding to the 1953 crop and it would have adhered strictly to the cash-basis method which it had adopted during the first year of its operations, the result would have been that the partnership would have

---

[2] A breakdown of these expenses in the income tax return is as follows:

| | |
|---|---|
| Cultivation | $ 21,227.47 |
| Miscellany | 5,255.09 |
| Fertilizers and herbicides | 17,241.40 |
| Laborers' insurance | 1,143.20 |
| Livestock feed | 64.58 |
| | $ 44,931.74 |

[3]

| | |
|---|---|
| Total Income | $103,991.10 |
| Nondeferred expenses | 48,413.42 |
| Profits | $ 55,577.68 |

[4] Section 9 of the Income Tax Act of 1924, 13 L.P.R.A. § 667(b) (1955).

As to the amount of losses to be carried back and to be carried over under the Income Tax Act of 1954, see § 122 of Act No. 91 of June 29, 1954, 13 L.P.R.A. § 3122 (Supp. 1962).

determined a net loss of $48,046.67,[5] *which loss it could not have carried over to 1953.*

On March 24, 1953, appellant partnership sold the property, including the plantations, the structures, the equipment, and the roots or stumps to Rafael Torrech Ríos, the selling price being distributed as follows: lands, $170,000; structures, $2,500; equipment, $15,800; "crop", $58,000; and stumps, $3,700.[6]

In the income tax return for 1953 the partnership reported a gross income of $4,386 consisting of two items: sale of the previous year's surplus sugar, $4,104.10; and profit from the sale transaction referred to in the preceding paragraph, $281.90. What we are actually interested in is that the cost of the "crop" was fixed at $47,695.60 as shown below:

"Cost of cultivation, etc. (expenses incurred in 1952 deferred in that year as corresponding to the 1953 crop, *and which represents the cost of the crop sold*)      $44,931.74

"Other harvest expenses incurred from 1/1/53 to 3/24/53      2,072.60

---

| [5] | | |
|---|---|---|
| Total Income | $103,991.10 |
| Less deductions | 93,345.16 |
| | |
| Profit from operations | 10,645.94 |
| Loss 1951 | ($58,792.61) |
| Net loss | ($48,046.67) |

[6] It is strange that the selling price of the lands, the structures and the stumps corresponds exactly with the purchase price two years previously, as per deed No. 12 of March 6, 1951 executed before Notary Víctor A. Coll, so that no profit was reported in the disposition of these capital assets.

A small loss of $597 was determined as to the equipment, since on the date of the sale its cost less accumulated depreciation was $16,397.

It therefore appears that the entire profit from the "sale operation" was attributed to the disposition of the plantation in connection with which the sum of $44,931.74 had been deferred.

"Miscellaneous cultivation expenses from 1/1/53 to
3/24/53                                                            1,703.89

                                                                  _____
                                                                  $48,708.23
Less: Adjustments of workmen's in-
    surance premiums (second semester
    of 1952–53), as per liquidation of
    12/24/53                                     $1,139.55
    Premium charge for 1951–52, as
    per reliquidation of 9/16/53                    126.92      1,012.63
                                                 _____     _____
                                                               $47,695.60"

In disallowing the cultivation expenses deferred for the year 1952 as part of the cost of the plantation sold, the Secretary of the Treasury determined a profit of $45,213.64 from the sale of the property. In the notice of deficiency he set forth as ground that such item had been "eliminated because it corresponded to 1952, since these expenses were paid in that year and should be deducted by that date in accordance with the 'cash' method."

The partnership appealed to the Superior Court, San Juan Part, challenging the deficiency determined and expressly alleging in the pertinent part that in order to determine the profit realized *"from the sale of a farm"* in 1953 it had the right to include "as part of the cost of such *farm"* the sum of $47,695.60, "cost of the cultivation of cane in the property." The position consistently assumed by the Secretary during the hearing of the case was that the taxpayer's deferral to 1953 of part of the expenses actually incurred and paid in 1952, constituted a change in its accounting method for which his consent had not been requested nor obtained. Appellant alleged that in view of the fact that late in 1952 it had decided to discontinue the agricultural operation and proposed to sell the farm—which it actually did in 1953—such expenses were considered as cost for the purpose of determining the profit obtained in the sale trans-

action. It is in the brief filed in the trial court that for the first time it shyly refers to the change from cash-basis to the accrual method permitted by § 50 of the Regulations of 1924, which reads as follows:[7]

"*Inventories of Livestock Raisers and Other Farmers.*— (1) Farmers may change the basis of their returns from that of receipts and disbursements to that of an inventory basis provided adjustments are made in accordance with one of the two methods outlined in (A) and (B) below. It is optional with the taxpayer which method is used, but having elected one method the option so exercised will be binding upon the taxpayer and he will be precluded from filing amending returns upon the basis of the other method.

"(A) Opening and closing inventories shall be used for the year in which the change is made. There should be included in the opening inventory all farm products (including livestock) purchased or raised which were on hand at the date of the inventory and there must be submitted with the return for the current taxable year an adjustment sheet for the preceding taxable year based on the inventory method, upon the amount of which adjustment the tax shall be assessed and paid (if any be due) at the rate of tax in effect for that year. Ordinarily an adjustment sheet for the preceding year will be sufficient; but if, in the opinion of the Treasurer, such adjustment is not sufficient clearly to reflect income, adjustments for earlier years may be accepted or required. Where it is impossible to render complete inventories for the preceding year or years, the Department will accept estimates which, in its opinion, substantially reflect the income on the inventory basis for such preceding year or years; but inventories must not include real estate, buildings, permanent improvements, or any other assets subject to depreciation.

"(B) No adjustment sheets will be required, but the net income for the taxable year in which the change is made must be computed without deducting from the sum of the closing

---

[7] This section substantially follows the text of the first part of § 22(c)–6 of the Regulations of 1954, 13 R.&R.P.R. § 3022(c)–6.

inventory and the sales and other receipts, the inventory of livestock, crops, and products at the beginning of the year; *Provided however,*

"(a) That if any livestock, grain, or other property on hand at the beginning of the taxable year has been purchased at the cost thereof not charged to expense, only the difference between the cost and the selling price should be reported for the year in which sold;

"(b) But if the cost of such property has been charged to expense for a previous year, the entire amount received must be reported as income for the year in which sold.

"(2) Because of the difficulties of ascertaining actual cost of livestock and other farm products, farmers who render their returns upon an inventory basis may at their option value their inventories for the current taxable year according to the 'farm-price method,' which provides for the valuation of inventories at market price less cost of marketing. If the use of the 'farm-price method' of valuing inventories for any taxable year involves a change in method of pricing inventories from that employed in prior years, the open inventory for the taxable year in which the change is made should be brought in at the same value as the closing inventory for the preceding taxable year."

The Superior Court, San Juan Part, dismissed the complaint apparently on the basis of lack of authorization from the Secretary of the Treasury to change the accounting method made by the taxpayer in deferring to the following year expenses incurred and paid in 1952. The court said: "The Act does not prescribe any uniform accounting method, but once a method is employed, it should be consistently used unless a change is made with the authorization of the Secretary of the Treasury, conforming the same to the circumstances of each case. It was not so done in this case." We issued a writ to review the judgment rendered.

■ (1) Farmers may employ one of three accounting methods in preparing their income tax returns: (1) the cash-basis method; (2) the accrual method; and (3) the

crop-basis method. In the first method the farmer includes the income items when he receives money in cash or its equivalent and deducts the expenses when they are paid in cash or its equivalent. Under the crop-basis method the computation of the income is generally made by deducting from the gross income obtained in the liquidation of the crop all the expenses incurred in the planting, cultivation, harvesting and sale, even if these expenses were incurred in a different year.[8]

As a general rule, under the accrual method all income and expenses are reported when incurred, regardless of the date they are received or paid. For the purpose of determining the gross income under the accrual method, the farmer is required to use an inventory. The income is determined by adding (1) the closing inventory, (2) the amounts received from sales during the taxable year, and (3) other miscellaneous income, and deducting from the result obtained (1) the opening inventory and (2) the cost of the products purchased during the taxable year. Section 76, second paragraph, of the Regulations of 1924; *cf.* § 22(a)–7 of the Regulations of 1954, 13 R.&R.P.R. § 3022(a)–7. Section 46 provided that the basis for valuation of the inventory could be (1) cost and (2) cost or market value, whichever is lower, and (3) "because of the difficulties of

---

[8] Section 76 of Regulations No. 1 of the Income Tax Act of 1924 provided that "If a farmer is engaged in producing crops which take more than a year from the time of planting to the time of gathering and disposing, the income therefrom may be computed upon the crop basis; but in any such cases the entire cost of producing the crop must be taken as a deduction in the year in which the gross income from the crop is realized."

Section 110 of those Regulations provided that "Where a farmer is engaged in producing crops which take more than a year from the time of planting to the process of gathering or disposal, expenses deducted may be determined upon the crop basis and such deductions must be taken in the year in which the gross income from the crop has been realized."

See §§ 22(a)–7(c) and 23(a)–11 of the Regulations of the Income Tax Act of 1954, 13 R.&R.P.R. §§ 3022(a)–7(c) and 3023(a)–11.

ascertaining actual cost of . . . other farm products," § 50(2) permitted the "farm-price method" which consists in the valuation of the inventory at the market price less the direct cost of its marketing or sale.[9]

For the different accounting methods and especially for farmers, see *Bravo v. Treasurer of Puerto Rico*, 76 P.R.R. 145 (1954), *aff'd*, 220 F.2d 651 (1955); *Buscaglia, Treas. v. Tax Court*, 65 P.R.R. 339 (1945); *cf. Clínica Juliá v. Sec. of the Treasury*, 76 P.R.R. 476 (1954); 2 Mertens, Law of Federal Income Taxation, § 12.136 (1961); Maleson, *Farmers and the Federal Income and Related Taxes*, 8 Syracuse L. Rev. 145 (1957); Erbacher, *Farmers are Taxpayers, Too*, 33 Taxes 95 (1955); *Farmers and the Federal Income Tax*, 19 U. Chi. L. Rev. 522 (1952); Throckmorton, *Federal Taxation of the Farmers*, 34 Iowa L. Rev. 251, 257–66 (1949); Keaton, *Practical Farm Problems*, 22 Ind. L.J. 151, 152–53 (1947).

■ (2) This brief history leads us to consider the need for authorization or consent of the Secretary of the Treasury before making changes in the accounting method employed by a farmer for submitting his income tax returns. First it is well to point out that the fundamental purposes in requiring the consent of the Secretary to make changes in the accounting method employed by a taxpayer are to encourage consistent practices to insure uniformity in the collection of taxes and to protect the treasury against the loss of revenue. *C.I.R. v. O. Liquidating Corporation*, 292 F.2d 225 (3d Cir. 1961); *Wright Contracting Co.*, 36 T.C. 620, 634 (1961). As was said in *Advertisers Exchange, Inc.*, 25 T.C. 1086, 1092–93 (1956), *aff'd*, 240 F.2d 958 (2d Cir. 1957), "Consistency [in the manner of declaring the income] is the key and is required regardless of the method

---

[9] These three methods are recognized at present in § 22(c)–6 of the Regulations of 1954, 13 R.&R.P.R. § 3022(c)–6. The "Unit-livestock-price" method is also admitted as respects livestock.

or system of accounting used . . . . And a change from one method of accounting to another is seldom possible without some distortion of income."

■ ■ Section 65(3) of Regulations No. 1 of 1924 establishes the general rule on the matter. It requires the permission of the Secretary for any change in the accounting method employed to file the returns by means of an application which shall be made at least 30 days before the close of the taxable period to be covered by the return. As is logical to assume, the application should be accompanied by a statement specifying the kinds of income to be treated differently in each one of the methods and the amounts which shall be duplicated or omitted as a result of the proposed change. *Cf.* § 41–2(c) of the Regulations of 1954, 13 R.&R.P.R. § 3041–2(c).[10] By way of exception, in the case of farmers, such consent is not essential for the change from cash-basis method to that of inventory. Section 50 of the Regulations copied at the beginning of this opinion corresponds verbatim to § 1616 of Federal Regulations No. 65 of 1924.[11] In *Kenneth S. Battelle*, 9 T.C. 299 (1947), which was followed and ratified in *Angel Milani*, 1947 P-H T.C. Memorandum Decisions 47,280, the Tax Court held that the permission of the Commissioner of Internal Revenue was not necessary for such change. Therefore, if the action of the taxpayer in this case *actually* constituted a change from the cash-basis to the inventory method, the permission of the Secretary was not required and the ground adduced by the trial court to dismiss the complaint could not prevail.

■ A careful reading not only of § 50 *supra*, but of other provisions relative to the inventory method, convinced

---

[10] Tansill, *Changing Accounting Methods*, 38 Taxes 997 (1960); Edelson, *Changing Accounting Periods*, 23 Taxes 408 (1945), may be consulted.

[11] It is substantially identical with §§ 39.22(c)(6), 29.22(c)(6), and 19.22(c)-6 of Federal Regulations Nos. 118, 111 and 103.

us that farmers are not permitted to include growing crops in the inventories employed by them in determining their taxable income. The provisions invoked refer to "farm products [including livestock] *purchased* or *raised* by the taxpayer," and further on "to any livestock, grain, or other property on hand at the beginning of the taxable year [which] has been *purchased*." Section 45, which refers to the need of inventories, provides that they shall include "all finished or partly finished goods"; and § 46 referring to valuation of inventories, insofar as it applies to farmers, may be easily read in regard to loose or lump farm products, but the section will be difficult to understand if it is sought to be applied to embrace growing crops. By reading the second paragraph of § 76 the same conclusion is reached. The interpretation of the Federal Bureau of Internal Revenue is consonant with that which has been heretofore expressed. In I.T. 1368, CB-I-1 (1922), p. 72, it is said: "While farmers may report their gross income upon the accrual basis (in which an inventory to determine profits is used), they are not permitted to inventory growing crops for the reason that the amount and value of such crops on hand at the beginning and end of the taxable year cannot be accurately determined. If a farmer is engaged in producing crops which take more than a year from the time of planting to the time of gathering and disposing, the income therefrom may be computed upon the crop basis." As an echo to this question, in connection with the regulatory provisions adopted under the income tax laws prior to 1934, Paul and Mertens conclusively expressed that "farmers will not be permitted to inventory growing crops." 1 Law of Federal Income Taxation 687, § 13.39.

■■ On the other hand, the income tax returns filed by appellant for the years 1952 and 1953 do not show any attempt to change the cash-basis method in order to adopt

the inventory method, as there is neither opening nor closing inventory for each of such years.[12] *Cf.* O.D. 939, C.B. 4 (1921), p. 54. The information contained therein rather shows that the taxpayer intended to employ the crop-basis method, since it refers to the "farming cost" and to "deferred expenses." And in order to change to the crop-basis method the Secretary's consent was required. I.T. 2614, C.B. XI-1 (1932), p. 48.[13]

Having concluded that the taxpayer could not defer to 1953 part of the expenses incurred and paid in 1952 because it constituted a change in the accounting method which was not authorized by the Secretary of the Treasury, we need not consider the question whether the amount so deferred constituted the "cost" of the growing crop sold in 1953. Such duplication shall not be permitted.

The judgment rendered by the Superior Court, San Juan Part, on November 15, 1961, will be affirmed.

---

[12] This requirement was met in *Battelle* and *Milani.*

[13] When the change of method intended was discussed in the light of the sale of the farm, the taxpayer's representative stated that "if he had continued operating the farm and had not sold, there is no question that the Treasurer would be right." Tr. Ev. 46. It should be noted that the income tax return for 1952 was filed on March 16, 1953 and that the sale was transacted eight days later.